Case No. 16-1296, Duke Energy Carolinas, LLC Petitioner v. FEDERAL ENERGY REGULATORY COMMISSION Mr. Whitaker for the petitioner, Ms. Chu for the respondent. Mr. Whitaker, I think we're ready for you. Good morning. Duke is challenging FERC's decision below to provide only a 40-year license to Duke and the new license for the Catawba Waterway Project instead of the 50 years that Duke requests. FERC's policy is to provide 40-year terms when the measures on their new license are moderate and 50-year terms when they are extensive. FERC below decided in this case that the measures were only moderate and not extensive. Duke believes that the record demonstrates beyond all doubt that the measures Duke is going to implement under the new license are extensive and therefore that FERC's decisions are arbitrary and capricious and not supported by substantial evidence. I'll ask counsel for the commission, but I'd like to ask you as well. In the rehearing order in paragraph 23, the commission is speaking where it says, while project measures and related costs might arguably appear to be similar in given cases, it's not possible to compare the measures and related costs regarding one license with those of others. In the absence of a thorough analysis comparing size, circumstances, et cetera, where in the record would we find that analysis? It's not in the record, Your Honor. There is no analysis. What I'm trying to understand is Duke presented its application, and then what came back to your client? Just a conclusory statement or some type of report and analysis? Yes, Your Honor. Duke filed its relicense application, and in comments on a draft environmental impact statement during the proceeding, Duke laid out its argument for why it should be entitled to a 50-year license, relying on cases where other cases where FERC had granted 50-year licenses, and Duke explained the extensive costs it would incur in implementing the new license. But when FERC got around to issuing the license, the ordering paragraph dealing with license terms, it set out its standard policy, which is if you have a moderate amount of measures, you get a 40-year term. Extensive measures, you get a 50-year term. And then it summarized the measures that Duke would have to implement under the new license and concluded that these are only moderate, and therefore you get a 40-year license. So that was the only thing FERC said in its original order. Right. And we filed a request for re-hearing pointing out the errors in FERC's ways, some of which are Duke was not treated like similarly situated applicants. FERC's policy where they use this new qualitative assessment where they don't look at cost to determine the license term is nothing more than we know it when we see it approached, that this Court has twice said agencies can't rely on to make their determinations. And then FERC, in its re-hearing order, essentially reiterated is we get to rely on, from what you were reading, we get to make our qualitative decision and don't bother us in trying to make us compare to what we, you know, the facts in previous cases. So I guess my next question is, you understand the nature of the projects that your client is going to undertake, and that was all revealed to the agency. What I'm trying to understand is I didn't see any comparison other than what I'll call sort of a legal argument going on, that one project is different from another. But suppose somewhere there must have been a staff analysis saying, well, in this particular instance, hypothetically, your client only has to build eight habitats. In the Niagara project, they had to build 12. And that type of back and forth, is that... There is no such analysis in the record. But summarize the summary of the measures under Duke's license, and then it made its conclusion it was lauderant. So the re-hearing order has some analysis of competing prior projects, right? Well, it referenced a couple of projects, a Douglas County PUD case and a case for Progress Energy. It said the measures under Duke's license were comparable to the measures under those licenses. But once again, FERC did a summary of the measures in the other projects and compared it with the summary that they've already done in Duke's project. FERC doesn't get into, now apparently, they're saying one's comparable, one isn't comparable, and they're now saying they don't even look at costs. You would think that they actually want to compare them. They would look at things, well, is one project providing comparable benefits to the fishery resources, or is one providing different benefits for those, the recreational user days are going to be enhanced more in that case, or one's going to enhance water quality more than the other. In other words, actual facts. FERC just didn't identify any facts, it just made general conclusions. Well, but it has the facts your client submitted. That's correct. All right, and it has knowledge of what's in the other cases as to what information was submitted that's before the commission. And the fact that it has a summary doesn't necessarily mean it's arbitrary and capricious. Well, Your Honor, I don't know how this court or any court could review a FERC decision when they just summarize the measures and declare them moderate or insensitive. It seems to me they have to provide a more reasoned explanation for their action instead of just a generic summary. You know, we admit FERC has expertise, we admit that it's entitled to deference, but it still has to explain itself, and it hasn't done that. Are you saying there has to be some objective numerical measure? Well, it doesn't necessarily have to be a numerical measure, but something you can actually quantify in some respect. For example, you know, maybe our project is bigger and should have done, we'll look at the benefits of provides recreation, and a smaller project wouldn't have to provide that many benefits. It doesn't have to be precision in terms of numbers, but you've got to kind of give a fair weighing of different actual facts in each case. The problem is we have a statute that I guess could not be vaguer. It just says, any license issued by the commission under this section shall be for a term which the commission determines to be in the public interest, but not less than 30 nor more than 50. Sort of leaves a lot of room to the commission. It does, Your Honor. I agree with you entirely. But even where it aims to grant FERC discretion, it still has to explain itself, and we don't think FERC explains itself. For example, in FERC's 2008 brief to this Court in the Eastern Niagara proceeding, where FERC was trying to defend issuance of a 50-year license for the Niagara project, FERC said that its established policy was to base license terms on the cost of the measures to be implemented in the new license, either on a stand-alone basis or in terms of their impact and their benefits. And then we think in that situation, FERC has not treated us like similarly situated applicants. Let me ask you, though. Pardon me? The way I'm reading the rehearing order is the commission does have a footnote where it talks about how it's distinguishing the Niagara project. And then it goes on to say, first, some of the cost figures that your client submitted are unsupported. Then it says the reliance on the agreement between the parties overstates the language of the agreement. So that's different. It says you haven't indicated that, at least FERC drops another footnote saying, it's not clear that all the enhancements and mitigation measures required constitute new measures. Some have already been implemented. And then it says, in any event, you haven't made any showing of agreement. And as a result of only getting the 40-year license. So those are four reasons. And at least FERC's distinctions. So, I mean, to that extent, it's given reasons as to why it's concluded that what your client has to do is moderate as opposed to extensive. Well, if I understand your question, Your Honor, in terms of the cost, FERC said it had problems with the cost information that we provided. But I'll note one initial thing on that is, FERC agreed entirely with Duke that our estimate of the lost generation costs we're going to have every year of over $7.6 million is 100% accurate. And that amount, $7.6 million, exceeds the annual amount, a cost that was incurred by the licensee in the Niagara Project proceeding and the other four projects that FERC cited in support of itself in that proceeding. To the point about where FERC said it didn't think. In the rehearing order. I'm sorry. In the rehearing order. I read the rehearing order basically to be saying that FERC thought Niagara was an outlier. They used that word and they just thought. Yeah, in fact, in the footnote that Judge Rodgers referenced, the commission said, although the commission in the Niagara Rehearing Order did use cost as a significant part of the analysis, the commission does not generally treat cost as dispositive. And then it goes on to say that that... Let's see. While we agree with Duke Energy that the measures required with respect to the substantially larger Niagara Project do not appear greater than those required for this project, which is your point, we view that older case as an outlier that is not consistent with the majority of more recent orders. So it's just saying, yeah, actually you're making a fair point about Niagara if you just look at cost, but that what we did there is just an outlier. Well, that's a convenient way for them. They don't have any answer to Niagara, so they call it an outlier. But I don't think it's an outlier at all. I think if you look at the consumer's power case, this is the case that FERC always cites for its license term policy. It's actually set out on pages 45 and 46 of our initial brief. FERC explains why its license term policy, and by my count, there are like eight references to cost and adverse impacts to the economics of the project. So I view that as FERC has always relied on cost. And if you look at, and so Niagara really isn't an outlier. I think FERC's action below where they do a qualitative analysis and don't take cost into account at all, that's the outlier. So suppose that, I'm not saying that you're wrong about that, but let's just suppose that we don't deal with that part of the argument and all we're talking about is your submission that it can't be squared with Niagara. If FERC just says in its order, just with respect to Niagara, you know, you're making a reasonable point. We just got that one wrong. It wasn't consistent with what we usually do. We just don't follow that approach as a general matter and we're not going to follow it here. That one was an outlier. Do they need to do something more than that? Well, it's not just Niagara. It's the cases that FERC relied on in its brief to this court where it says, look, these other four cases, they're a precedent for us granting a long-term license, a 50-year license to Niagara, and it sets out the annual cost of each of those projects. And it ranged from $2.5 million to $6.25 million. And here in Catawba, we have the annual cost of $25 million. Right, but that presumes that cost is the overriding consideration, and I think your point is Niagara is the best example of a situation in which costs were really, really significant. The other cases, FERC would say, yeah, you can look at the cost, but costs aren't the overriding consideration. Niagara is the one where costs might appear to have been an overriding consideration. We grant you that. We just didn't do what we usually do in that case, and it's just an outlier, and so we're just not going to do that. With all due respect, Your Honor, I think it's really not an outlier because if you go back to the genesis of the license term policy, consumers' power, it's all about costs. So I get that part of your argument, which is that, in fact, the wrong to call it an outlier is, in fact, consistent with the other ones, in which case you'd have your argument. Okay. Questions? Thank you. May it please the Court. Susanna Chu for the Commission. The Commission here, responding to Judge Rogers' question initially, the Commission here made a factual determination based on its knowledge of the measures involved in the Catawba license versus its knowledge of numerous other hydroelectric license orders, and the Commission found that the nature and extent of the license measures here are not unusual for a large-size project and were comparable to measures in two recent cases where licensees received 40-year terms. This is in paragraph 13 of the rehearing order at JA-789, footnote 14. And Duke does not argue on brief that the Catawba measures exceed the scope of the measures in those two cases. One of them involves the Yadkin PD dam, which is operated by a Duke affiliate, and is located in an adjacent water basin in the same state. It's also in North Carolina along a river that also originates in the Blue Ridge Mountains. The Douglas County project is in Washington State, and the Commission also found that that project was comparable. This goes to the heart of the Commission's discretion under this statute to use its informed judgment to make these kinds of licensing calls. Here, the Commission was well within its discretion when it found that this particular set of measures is more like Yadkin and Douglas County and less like Niagara and the other cases cited by Petitioner. Well, I understand the site to Douglas County because that was decided in 2012 and then reaffirmed on rehearing in 2013. But, of course, the other affiliate Duke case, that was decided when the rehearing request was pending. So at the point Duke files its application, you have this Douglas case and you have Niagara. And so following up on Judge Srinivasan's comments in terms of the rehearing orders treatment of Niagara, what struck me, and maybe I'm just wrong in focusing on this, in paragraph 23, the Commission seems to acknowledge that it does have to make some analysis, all right?  Well, Your Honor, so the analysis, it is in paragraph, I believe it's in paragraph 13 and in that footnote citing Yadkin and Douglas County. And also, just to put this in context, typically the Commission sets a license term at the end of its license order. So by the time that you reach the license term decision, there has been extensive discussion of all of the measures that are required under the new license. So the Commission has already done this extensive analysis. In this particular case, it's examined the comprehensive settlement agreement and has decided to adopt certain of its measures. So on getting at this, maybe you, I'm sure you understand this better than I do, but Duke wants to do something in two states, all right? Duke owns a lot of this property already. So it's hooking up things and it has to make some adjustments. This is hypothetical, but I'm just trying to understand this. Sure. So these hookups, they're going to cost Duke some money, but it's really not a big deal. Whereas in Niagara or in some of these other cases, you're talking about taking two different systems, putting them together. There's a lot more going on, and at least it was the Commission's judgment at that point that those were extensive, whereas Duke, in my hypothetical, was just some fairly straightforward hookups. Now, you may understand that and Duke's counsel may understand that. I just couldn't find anything like that. It's not a question of where everybody knows that the Duke project is just a moderate one and everybody knows that these others were major undertakings. Otherwise, we're close to deferring blindly is what I'm getting at. I think I understand the question, Your Honor. I don't think the court is deferring blindly. I understand that the analysis may seem brief here. I think the court understands, too, that it is extremely difficult to compare these projects. Niagara is, of course, Niagara Falls. It's a single installation on a relatively short stretch of river, and here we have a project that involves 11 installations along a 300-mile stretch of river. So it's certainly true that it's always possible for the Commission to have a more extensive discussion, but I think that the discussion in these orders is adequate under the standards that are applicable, especially under the statute. The Commission hasn't said that it's redoing Consumer Power until it comes out with its October 2017 order saying now it has a default of 40 years. And I don't read the Commission to be saying cost is not a serious consideration. It's just not determinative necessarily. And if that's so and it's going to do this qualitative approach, doesn't it have to give us some analysis of the qualitative differences? Well, Your Honor, I think the Commission did do that here. It did provide examples of the most significant measures involved in this project, and those are the bladder dam and the fish passage facilities. That's in paragraph 13 of JA-789. So I think here the Commission was considering everything before it. It considered the facts before it, the facts of the measures, and it also considered Duke's costs, and it said that Duke's costs do not override the factual determination here that this project is more similar to Yadkin and Douglas County than it is to these other cases in which 50-year licenses have been granted. I would like to point out something about Niagara as well. The order, of course, as you know, acknowledges that the Commission defended its issuance of a 50-year license in Niagara, at least significantly on cost grounds. But the order also points out that the Niagara case is an outlier and also that the license order in that case, which granted a 50-year term, didn't actually discuss costs. Costs came up on rehearing in response to an argument that the 50-year term wasn't justified. And I will also note on background that Niagara involved a settlement agreement in which the parties all agreed to a 50-year term. I mean, costs might not have come up until the rehearing in kind of crystallized form in Niagara, but the way the costs were discussed in rehearing, it seems different from the way that costs are discussed in the mine run of situations, as you yourselves described. That's right, Your Honor, and the Commission did acknowledge that and said that that discussion really is an outlier. It really isn't consistent with all of its precedent. Since Consumer's Power issued in 1994, the Commission has consistently applied a fact-sensitive determination to every hydro licensing project license term decision that's made. What is the underlying point or rationale for a 50-year license rather than a 40? Is it based on how much of an investment, whether you measure it qualitatively or quantitatively, the company makes and therefore how long it needs or is entitled to, either economically or in some other way, to earn it back or to have justified the initial investment, or is there something else? Your Honor, I think that's a fair consideration. I think Consumer Power points out that part of the rationale for longer-term licenses, that is 40 or 50 years, 40 years is considered a longer term, too. Those longer-term licenses are designed to encourage license applicants to be better environmental stewards and to take a long-term comprehensive approach to improving the waterways. This is all designed to kind of have projects that are best adapted to the development and the beneficial use of a particular waterway. So if Duke Energy wanted to be sure that they were doing enough to get a 50-year license, how would they know what they needed to do? Well, Your Honor, I'd say that they would know that it relates to the extent of the measures that are being implemented, and Duke could have negotiated a 50-year license term with the settlement parties, and the Commission would have taken that into consideration. It wouldn't have been dispositive, but it would have been considered if all 70 parties who signed on to that settlement agreement had actually agreed to a 50-year term. In fact, they agreed to 40 to 50 years. That's like a different – is there a back and forth with the Commission? Can Duke come in and say, we're ready to invest any amount necessary to get this to 50 years, what do you want? Is there such a thing? And here's what we've done so far, what more need we do? It is an iterative process. I believe that Duke could have submitted something to the Commission making that very clear. I'll also point out that one factor in this case was the Commission ordered a bladder dam, and Duke, in certain cost estimates, provided estimates for a gate instead, which is substantially more costly, $40 million versus $10 million for the bladder dam. So if Duke really believes that a gate is necessary or desirable, it could come in – in fact, would have to come in and seek an amendment of the license to authorize that gate. But it could come in and ask for an extension. They could ask for an extension. I'm asking, what is it that they could have asked for that the Commission would have said, okay, this is 50-year value rather than 40-year value? It's hard to say standing here now, but there are certainly measures that would be more extensive, more costly. I think Petitioner points out that fish passage facilities – I mean, there are ranges of fish passage facilities. This particular case involved the trap and transport facility, and there are more expensive measures such as fish ladders or even fish elevators. I'm a little confused by the premise of this. Is it true that if a licensed applicant wants to get 50 years, that FERC would negotiate with them to award a 50-year license as long as they did enough, or is it the case that in some situations the nature of the project is just such that 50 years isn't any offing? That's a good point, Your Honor. I think that's right. The Commission doesn't negotiate with the licensed applicant over the term. I don't know the answer. I'm just curious to know what's – Right, right. But I think it is an important point that it's not that the Commission is negotiating with the licensed applicant, but if there are indeed more extensive measures that, say, Duke and other signatories had agreed to, that the Commission found to be justified, and if the Commission actually incorporated those agreements, like those more extensive measures into the license, then it's certainly possible that a 50-year term could have been awarded. But it's really FAP-specific. I suppose there might be something on the other side, this difference between the bladder and the ladder. The more Duke spends, the more they're going to need back from the ratepayers. Is that right? Yes. This is kind of a different analysis in terms of the length of the license term. It's a different, but I suppose in addition to wanting to encourage environmental things, you don't want to encourage expenses for the sake of expenses. That's right, Your Honor. So I'm back on the question of how Duke will know what is necessary for the 50-year. The Commission has acknowledged that certainty is important to the industry, and so as the Court may be aware, the Commission has very recently issued a licensing term policy statement. And that new policy statement, which sets a 40-year default term, with the ability to grant terms less than or greater than 40 years, that's designed to give industry participants and stakeholders additional certainty and clarity. The Commission recognizes that this is a difficult area. I mean, it's very fact-intensive, and it's hearing from stakeholders that additional certainty is important. Okay. You heard me say what I read to be the four reasons that the Commission gave on rehearing. You may not agree with those and let me know if I'm wrong about them. But in any event, it said some of the information provided by Duke has been shown to be unsupported or at least some degree inconsistent with the license. Yes, Your Honor. All right. So we have no idea whether that's, you know, 1% of a problem or 51% of a problem. Then it says Duke is over-reading this agreement. So the Commission says, you know, there's no basis for us accepting that, as I read it. Then it says, furthermore, some of these measures aren't new. And that's in footnote 45. Yes. And then the fourth reason is Duke hasn't shown why it is agreed. So I took the Commission to say those four grounds were the basis on which it was relying for saying it would not grant a 50-year license. Was there more? Yes, Your Honor. So I think those are additional reasons. I think the heart of the Commission's rationale is paragraph 13, which talks about the most costly new measures required by the new license, which require fish and eel passage facilities, the construction of a bladder dam, new minimum flow and recreational flow release requirements, water quality and quantity monitoring, and various recreation improvements. Right. That's back to Douglas and the Duke. Right. So that's the heart of it, I think. And I think that the Commission made that factual determination and then found that Duke's reasons for a 50-year term, which are primarily cost-driven, do not override that factual determination. And on review, I don't believe that Duke has put forward any reasons why the substantive factual determination is erroneous. Can I just ask a conceptual question? So that's in the rehearing order of paragraph 13, and that's where the affirmative justification for 40 years lies, in your view, because it's comparable to other projects that also have 40 years in the degree of measures that are contemplated by the project. So if you look at the initial grant of the license, then the way that this works is if you have some measures, it's 30. If you have moderate measures, it's 40. If you have extensive measures, it's 50. That's our standard. Here's the measures that you have, A, B, C, D, E, F, G. Therefore, it's moderate. That doesn't sound like much of an analysis as to why the measures that are listed fit into one category or the other in terms of the initial order. I understand, Your Honor. But, again, putting it in context, that determination in the initial order comes after a very extensive discussion of all of the measures. So it is summary in nature. That typically is how the commission has done it in the past. It really, you know, by the time you've gotten to that point, there's been so much discussion about the specific measures, specific environmental construction requirements. And so if we go back. Yeah, and lots. Yeah, go ahead. No, go ahead. There's definitely lots of that, I guess, on classifying that lots as moderate. That's the bridge that, I guess, you're looking principally at Paragraph 13 of the rehearing order to do that work. Right, right. I mean, the commission here, it is exercising its expertise and its judgment. I mean, the commission administers numerous hydroelectric licenses. There are numerous cases in which the commission has awarded licenses of terms between 30 to 50 years. And there are so many factors that come into play that it's really an extremely difficult endeavor to compare each of these particular projects. They're just extremely different. Okay, thank you. Thank you, Your Honor. Does the commission have more time? I'm afraid to use them up, but we'll let you have another two anyway. What the heck? Just a couple points. Counsel for FERC said that FERC discussed the cost angle in that one paragraph where they said the most expensive measures are the bladder dam and the fish passage facilities. When you look at the record, it's clear they didn't get a close read of this because there were $57 million worth of facilities that Duke is going to be implementing under the license. And these were the bowl and towel size thing on page 18 of our initial brief. Those items are more expensive than the items that FERC referenced in their order as being the most expensive thing. What's the end of your sentence? I couldn't hear it. I'm sorry, Your Honor? Could you repeat what you just said, the last sentence? I just didn't hear the end of it. Yes, in paragraph 13 of the rehearing order. Right. FERC says the most costly new measures required by the new license include the enagement of fish and eel passage facilities, construction of the bladder dam on the water spillway, new mineral flow, recreation flow release requirements. Right. Those are not the most expensive things. The most expensive things are the $57 million of facilities in terms of mineral flow turbines, new turbine runners, things like that. Those are the things we set out on towel size and emboldened on page 18 of our initial brief. So they just overlooked some things. They overlooked it, and we made a point. This is $57 million you missed, and we pointed that out to them in our rehearing request, and apparently FERC missed it again. Well, but FERC's response is they don't credit some of these numbers. Well, they said these numbers are unreliable. They pointed to three things. One was the thing that FERC counsel mentioned about the bladder dam. We put an estimate of $40 million in it, and we did that because we thought, based on our experience, we might have to do a more complicated structural mechanism in place of the bladder dam, and that would cost $40 million as opposed to $10 million. But we also pointed out to FERC, we pointed out in our briefs, that even if you take away those $30 extra million, the amount of money we're spending is still $124 million, and the annual hit to us is $22 million, but still far exceeds the ones in Niagara and the other projects that FERC relied on in its brief in the Niagara receipt. Judge Garland, I'm glad you asked the question about how is Duke supposed to know what it needs to propose to get a 50-year license. I mean, that's the danger that we know when we see it approached, that the regulated class can't figure out what it has to do to get a result that it wants. Here we are, two orders and one appellate briefing of this proceeding. Other than relying just on cost, which is, of course, a number which can be compared, but you agreed it doesn't have to be based on cost. If instead the agency wanted to do it the way it's doing it, how would it help you, rather than saying here's two previous ones, and if you want to get it, you have to be like them? Well, it wouldn't have to be a cost, but it has to be on something that FERC can identify and some kind of objective criteria in terms of whether they're making a decision and that they can articulate. Well, what? Can you give an example of what those would be, or are you saying it's not possible to articulate any criteria? They can do, like I said before, they can compare things like the benefits of fishery resources, both in access to habitat and populations, the actual not only just you're doing 58 recreational facilities, but how will that actually increase recreational user days and things like that. I mean, they can articulate those type of things. So what you think they need to do is instead of in footnote 14 listing these construction measures, they have to go into some architectural specification? No, I think they have to assess the benefit of these various measures. What's the actual impact? They don't have to look at the designs, but in terms of what benefit it's going to provide. And we should reward you in a longer-term license if you're going to provide more environmental benefits. So you kind of look at the results of those items. Okay. Thank you very much.  We'll take the matter under submission.
judges: Garland, Rogers, Srinivasan